STATE OF NORTH CAROLINA v. JAMES DAVID ROBERTS

No. COA00-229

(Filed 20 March 2001)

**1. Search and Seizure— investigatory stop—minimal intrusion for safety of officer**

An officer's initial contact with defendant amounted to an investigatory stop rather than an arrest when the officer grabbed defendant's hands and placed them on the wall in order to conduct a pat-down search of defendant's outer clothing after defendant had just exited from a high drug area and defendant refused to stop at the officer's request, because the seizure involved a minimal intrusion for the safety of the officer, and without more, did not convert the seizure into an arrest.

**2. Search and Seizure— motion to suppress—no reasonable suspicion of criminal conduct**

The trial court erred in a felony possession of cocaine case by denying defendant's motion to suppress evidence obtained in a search of defendant's person after an investigatory stop, since the evidence did not support the trial court's conclusion that an officer had reasonable suspicion to believe that defendant was involved in criminal conduct, because: (1) evidence that officers observed the black truck in which defendant was a passenger being operating upon public streets at 9:30 p.m. and that at times it traveled slowly, stopped at a convenience store for about four minutes, and later traveled through a neighborhood with a reputation for illegal drug transactions leads to nothing more than an inchoate and unparticularized suspicion or hunch of criminal activity; and (2) evidence that defendant walked away from the officer after he asked defendant to stop is not evidence that defendant was attempting to flee and only indicates defendant's refusal to cooperate.

Judge TYSON concurring in part and dissenting in part.

Appeal by defendant from judgment dated 12 May 1999 by Judge Zoro J. Guice, Jr. in Buncombe County Superior Court. Heard in the Court of Appeals 30 January 2001.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Thomas D. Zweigart, for the State.*

*David G. Belser for defendant-appellant.*

GREENE, Judge.

James David Roberts (Defendant) appeals a 12 May 1999 judgment entered after Defendant pleaded guilty to felony possession of cocaine and being an habitual felon.

On 5 April 1999, Defendant was indicted for felonious possession of a controlled substance and being an habitual felon. On 12 May 1999, Defendant filed a motion to suppress evidence seized from Defendant on the date of his arrest. At the hearing on Defendant's motion to suppress, Defendant called Officer Quinton Miller (Miller) of the Asheville Police Department to testify. Miller testified that on 28 November 1998 at approximately 9:30 p.m., he and Officer Frederick Anthony Waters (Waters) were "sitting just to the left of the entrance of Lee Walker Heights Apartments (Lee Walker Heights)" in a marked police vehicle. Miller and Waters observed a black truck driving toward them and "[i]t appeared the [black truck] wanted to make a right and go into the entrance [of] Lee Walker Heights," however, Miller believed the driver of the black truck saw Miller and Waters in the police vehicle, and continued driving straight. At that point, Miller could not identify the occupants of the black truck. Miller stated the driver did not do anything illegal, but "[h]e just looked suspicious."

Miller and Waters continued to "sit there at that location" and then noticed the black truck drive up to the "Hot Spot," a convenience store. At the time, the Hot Spot was closed and it appeared the driver of the black truck was looking up the street at Miller and Waters. Miller stated the occupants of the black truck looked "suspicious" sitting at a closed convenience store. Miller and Waters then moved their vehicle behind a business located on Biltmore Avenue and observed the black truck at the Hot Spot for approximately three or four minutes. The black truck was out of the officers' vision for about five to ten minutes. The next time Miller saw the black truck, "it was entering into Lee Walker Heights." Miller observed Defendant as a passenger in the black truck. Miller did not observe the black truck after it entered Lee Walker Heights, but he was aware the black truck stayed in Lee Walker Heights for "anywhere from one minute to one minute and fifteen or twenty seconds." Miller stated he was "familiar"

with the time the black truck remained in Lee Walker Heights because, based on his experience, "anyone going [to Lee Walker Heights] to visit or see someone, normally . . . take[s] . . . more than a minute, but . . . it takes about that long to make some type of transaction." Miller, however, did not observe the occupants of the black truck make any transaction, or engage in illegal activity, or observe the black truck stop during the time it was in Lee Walker Heights.

Once the black truck exited Lee Walker Heights, the driver made a left turn onto Short Coxe Avenue. The black truck "started going straight" and then stopped "right there in the middle of the road." Defendant got out of the black truck and the driver continued driving. Miller then stepped out of the police vehicle and Waters continued to follow the black truck. Miller "asked . . . [D]efendant to stop, initially[,] . . . [but] [D]efendant continued to walk toward the Hot Spot." Miller stated there was nothing in particular to indicate Defendant had a weapon in his possession, but Miller smelled alcohol and Defendant's walking away from Miller, after being asked to stop, exhibited aggression. Miller testified it was fair to say he stopped Defendant because he had "a general suspicion because [Defendant] was leaving a high drug area," along with "a combination of different suspicions." In addition to Defendant, "[t]here was another person standing out by the Hot Spot location." Miller stated Defendant had not engaged in any criminal activity that he was aware of and, other than Defendant leaving a high drug area, the facts that caused Defendant to be a suspicious looking person included:

> [t]he fact that the vehicle in which . . . [D]efendant was riding approached Lee Walker Heights . . . , started to turn into Lee Walker Heights, and then turned and continued straight; [and] the fact that the vehicle that . . . [D]efendant was riding in was sitting at the Hot Spot while the Hot Spot [was] closed with his lights off.

After Miller "caught up with" Defendant, he asked Defendant to place his hands on the wall. Defendant, however, continued walking and Miller stated he "had to grab [Defendant's] hand and place it" on the wall to protect his safety. Miller started talking to Defendant and explained to Defendant that "[Defendant] had just exited from a high drug area, open air drug market," and Miller was going to pat down Defendant for Miller's safety. Miller's pat down of Defendant revealed no weapons, but upon placing both his hands against Defendant's chest, Miller "felt an object. The contour of it and the mass led

[Miller] to believe that it was some type of contraband." The object "felt like a little pebble . . . . It's not like a round rock. It's a contour of it." After patting down Defendant for weapons, Miller then reached into Defendant's pocket and removed .02 grams of crack cocaine.

On cross-examination, Miller testified he had been employed with the Asheville Police Department for approximately five years and was very familiar with Lee Walker Heights and the drug trade that occurs in that area. Based on Miller's experience, it takes about a minute to drive through Lee Walker Heights and "if someone is standing out on the street . . . it doesn't take anywhere from ten or fifteen or twenty seconds to make a [drug] transaction." According to Miller's experience, the Hot Spot had been used for drug transactions as well. Miller stated that in addition to Defendant not listening to his request to stop and talk and not placing his hands on the wall, Defendant's walking away from Miller and Defendant's smell of alcohol caused "a great concern" with Miller. Upon feeling the object in Defendant's pocket, Miller "instantly formed the opinion that it was crack cocaine." When Defendant was in the process of being arrested, Defendant stated the crack cocaine "was for some woman" standing near the Hot Spot.

Waters testified for the State that he was patrolling with Miller on 28 November 1999. Waters stated the black truck appeared as if it were going to turn into Lee Walker Heights, however, it proceeded to drive straight. The next time Waters observed the black truck it was parked at the Biltmore Grocery, also known as the Hot Spot. Based on Waters' experience, "all of the people that have c[o]me out [of Lee Walker Heights] within a two [minute] time limit ha[ve] purchased narcotics."

On cross-examination, Waters testified that before the black truck exited Lee Walker Heights he had already made the determination he was going to stop it based on the activity of the black truck before entering Lee Walker Heights. This determination was based on the black truck appearing as if it were going to turn into Lee Walker Heights, the black truck proceeding straight after possibly seeing the officers, the black truck being parked at the Biltmore Grocery with its headlights off, and then once the officers left, the black truck going into Lee Walker Heights. Although there was nothing illegal about Defendant exiting the black truck at the time he did, it raised Waters' suspicion.

The trial court entered findings of fact consistent with the evidence and concluded none of Defendant's constitutional rights had

been violated and Miller's actions were "based upon far more than some suspicion, but [were] based upon a reasonable suspicion based upon an objective view by [Miller] of all of the facts and circumstances which [Miller] had seen and observed." The trial court denied Defendant's motion to suppress the evidence seized.

---

The issues are whether: (I) Miller's seizure of Defendant constituted an arrest or an investigatory stop; and (II) Miller's seizure of Defendant was in violation of the Fourth Amendment.

I

**[1]** Defendant argues Miller's grabbing of Defendant's hands and shoving them against the wall amounted to an arrest. We disagree.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980) (opinion of Stewart, J.). Whether a seizure constitutes an arrest or an investigatory stop depends on the "nature and extent of the detention." *United States v. Place*, 462 U.S. 696, 703, 77 L. Ed. 2d 110, 118 (1983). The "critical threshold issue" in making this determination depends on the "intrusiveness of the seizure." *Id.* at 722, 77 L. Ed. 2d at 131 (Blackmun, J., concurring). A police officer is permitted to physically take hold of an individual and pat down the outer surface of his clothing for the safety of the officer. *Terry v. Ohio*, 392 U.S. 1, 26, 20 L. Ed. 2d 889, 908-09 (1968). This brief stop and pat-down search of an individual's outer clothing, without more, amounts to a minimum intrusion on the individual and does not convert the seizure into an arrest. *See id.* at 26, 29-30, 20 L. Ed. 2d at 908-09, 911.

In this case, at the time Miller grabbed Defendant's hands and placed them on the wall, a seizure occurred for purposes of the Fourth Amendment. After placing Defendant's hands on the wall, Miller conducted a pat-down search of Defendant's outer clothing. Miller's grabbing of Defendant's hands and placing them against the wall involved a minimal intrusion for the safety of Miller, and without more, did not convert the seizure into an arrest. Accordingly, Miller's initial contact with Defendant amounted to an investigatory stop and not an arrest.

## II

**[2]** Defendant next argues that even if his seizure did not amount to an arrest, Miller did not have reasonable suspicion to believe Defendant was involved in criminal conduct. We agree.

An officer who "observes conduct which leads him reasonably to believe that criminal conduct may be afoot" may stop the individual to make reasonable inquiries, *State v. Pearson*, 348 N.C. 272, 275, 498 S.E.2d 599, 600 (1998), employing "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238 (1983). The officer, however, must have more than an "inchoate and unparticularized suspicion or 'hunch' " of criminal activity, *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, but also must have "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity," *United States v. Cortez et al.*, 449 U.S. 411, 417, 66 L. Ed. 2d 619, 628 (1981). In other words, a stop is justified if, based on the totality of the circumstances, "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417-18, 66 L. Ed. 2d at 629. Factors which are properly considered in determining if an officer had reasonable suspicion include: activity at an unusual hour, *see State v. Watkins*, 337 N.C. 437, 442, 446 S.E.2d 67, 70 (1994); nervousness of an individual, *State v. McClendon*, 350 N.C. 630, 639, 517 S.E.2d 128, 133 (1999); high crime area, *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576 (2000); and unprovoked flight,[1] *id.* at 125, 145 L. Ed. 2d at 577. None of these factors, standing alone, are sufficient to justify a finding of reasonable suspicion, but must be considered in context. *Cortez*, 449 U.S. at 417, 66 L. Ed. 2d at 629; *Wardlow*, 528 U.S. at 124, 145 L. Ed. 2d at 576.

In this case, Defendant's seizure was not supported by reasonable suspicion. The officers observed the black truck being operated upon public streets at 9:30 p.m., which at times traveled slowly, stopped at

---

1. Although an officer, even without a basis for seizing another, is allowed to put questions to a person, *Royer*, 460 U.S. at 498, 75 L. Ed. 2d at 236, that person is not required to answer and indeed "has a right to ignore the police and go about his business," *Wardlow*, 528 U.S. at 125, 145 L. Ed. 2d at 577. A refusal to cooperate, " 'without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' " *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437, 115 L. Ed. 2d 389, 400 (1991)). "[U]nprovoked flight[, however,] is simply not a mere refusal to cooperate." *Id.* Flight is defined as an "act or an instance of fleeing, esp. to evade arrest or prosecution." *Black's Law Dictionary* 653 (7th ed. 1999).

STATE v. ROBERTS

[142 N.C. App. 424 (2001)]

a closed convenience store for about four minutes, and later traveled through a neighborhood with a reputation for illegal drug transactions. The black truck later stopped in the middle of the road and Defendant exited the vehicle, walking toward the Hot Spot. Miller approached Defendant and asked him to stop and Defendant continued to walk away. This evidence leads to nothing more than an "inchoate and unparticularized suspicion or 'hunch' " of criminal activity. *See Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909. Accordingly, Miller did not have a reasonable suspicion to stop Defendant[2] and, thus, any seizure of drugs from Defendant's person should have been suppressed. *See Place*, 462 U.S. at 710, 77 L. Ed. 2d at 123 (evidence obtained as the result of an unreasonable seizure is inadmissible).

The order of the trial court is therefore reversed, its judgment is vacated, and this matter is remanded to the trial court to allow Defendant to withdraw his guilty plea.

Reversed, judgment vacated, and case remanded.

Judge JOHN concurs.

Judge TYSON concurs in part and dissents in part.

TYSON, Judge, concurring in part and dissenting in part.

I agree with the majority's holding that Officer Miller's detention of defendant was an investigatory stop, and not an arrest. However, I respectfully dissent from Part II of the majority's opinion. I would hold that Officer Miller had reasonable suspicion to believe defendant was involved in criminal conduct based on the totality of the circumstances.

As the majority states, an "investigative stop and detention leading to a pat down search must be based on an officer's reasonable suspicion of criminal activity." *State v. Briggs*, 140 N.C. App. ——, ——, 536 S.E.2d 858, 860 (2000) (citing *State v. Sanders*, 112 N.C. App. 477, 481, 435 S.E.2d 842, 845 (1993)). "[T]he detaining officer must have a particularized and objective basis for suspecting the partic-

---

2. Evidence Defendant walked away from Miller after he asked Defendant to stop is not evidence Defendant was attempting to flee from Miller, and, thus, indicates nothing more than Defendant's refusal to cooperate. Therefore, this evidence is not considered in determining whether Miller had reasonable suspicion to stop Defendant.

ular person stopped of criminal activity" based upon the "totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417-18, 66 L. Ed. 2d 621, 628 (1981).

In *Illinois v. Wardlow*, 528 U.S. 119, 145 L. Ed. 2d 570 (2000), defendant fled upon seeing police vehicles patrolling an area known for heavy narcotics trafficking. Two officers caught up with defendant, stopped him and conducted a protective pat down search. *Id.* The Illinois Supreme Court held that flight upon approach of a police vehicle in a high crime area is insufficient to justify a reasonable suspicion of criminal activity. *People v. Wardlow*, 183 Ill.2d 306, 701 N.E.2d 484 (1998), *rev'd*, 528 U.S. 119, 145 L. Ed. 2d 570 (2000). On appeal by the State of Illinois, the United States Supreme Court held that the officers had reasonable suspicion of criminal activity to support an investigative stop based on the "totality of the circumstances". *Illinois v. Wardlow*, 528 U.S. 119, 145 L. Ed. 2d 570 (2000). In overturning the decision of the Illinois Supreme Court, Chief Justice Rehnquist wrote:

> [I]t was not merely [defendant's] presence in an area of heavy narcotics trafficking that aroused the officer's suspicion but his unprovoked flight upon noticing the police. Our cases have recognized that *nervous, evasive behavior* is a pertinent factor in determining reasonable suspicion.

*Id.* at 124, 145 L. Ed. 2d at 576 (emphasis supplied) (citations omitted).

In the present case, the majority indicates that the facts do not support the conclusion that defendant fled from Miller and Waters. I disagree. In *Wardlow*, Chief Justice Rehnquist wrote: "we cannot reasonably demand scientific certainty from judges or law enforcement officers . . . Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* at 125, 145 L. Ed. 2d at 577. In *United States v. Cortez*, the Supreme Court held that:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. *Finally, the evidence thus collected must be seen and weighed not in terms*

*of library analysis by scholars, but as understood by those versed in the field of law enforcement.*

*Cortez,* 449 U.S. at 418, 66 L. Ed. 2d at 629 (emphasis supplied).

Officers Miller and Waters testified to the following facts: they were following defendant, they called the dispatcher to report they were going to stop the truck, defendant saw that he was being followed, the truck abruptly stopped in the middle of the street, defendant and the driver split up, defendant walked towards a closed store, Officer Miller knew that defendant was aware the store was closed because he had seen defendant there earlier that evening, when Officer Miller asked defendant to stop, defendant refused, Officer Miller renewed his request for defendant to stop, and had to physically restrain defendant. Based on the totality of the circumstances and "commonsense judgments and inferences about human behavior", this was sufficient evidence that defendant was fleeing or exhibiting nervous, evasive behavior, and not merely going on about his business.

In *State v. Butler,* 331 N.C. 227, 233, 415 S.E.2d 719, 722, our Supreme Court held that there was sufficient evidence to provide a reasonable suspicion to stop defendant to investigate drug activity and to frisk him for weapons. Justice Whichard wrote:

1) defendant was seen in the midst of a group of people congregated on a corner known as a "drug hole"; 2) [Officer] Hedges had had the corner under daily surveillance for several months; 3) [Officer] Hedges knew this corner to be a center of drug activity because he had made four to six drug-related arrests there in the past six months; 4) [Officer] Hedges was aware of other arrests there as well; 5) defendant was a stranger to the officers; 6) upon making eye contact with the uniformed officers, defendant immediately moved away, behavior that is evidence of flight; and 7) it was [Officer] Hedges' experience that people involved in drug traffic are often armed.

While no one of these circumstances alone necessarily satisfies Fourth Amendment requirements, we hold that, when considered in their totality, Officer Hedges had sufficient suspicion to make a lawful stop.

The Court particularly noted that Officer Hedges saw the defendant "not simply in a general high crime area, but on a specific corner known for drug activity." *Id.* The Court recognized that the "mere

presence in a neighborhood frequented by drug users is not, standing alone, a basis for concluding that the defendant was himself engaged in criminal activity." *Id.* at 234, 415 S.E.2d at 722 *(citing Brown v. Texas,* 443 U.S. 47, 52, 61 L. Ed. 2d 357, 362-63 (1979)). The Court held that "defendant's immediately leaving the corner and *walking away from the officers*" after seeing them was an "additional circumstance" supporting a finding of reasonable suspicion. *Id.* at 234, 415 S.E.2d at 722-23. (emphasis supplied) *(citing United States v. Jones,* 619 F.2d 494, 498 (5th Cir. 1980) (individual's flight from uniformed law enforcement officer may be fact used to support reasonable suspicion "that criminal activity is afoot"); *United States v. Magda,* 547 F.2d 756, 758-59 (defendant's companion immediately moved away with a "rapid motion" after looking in direction of observing officer); *State v. Belton,* 441 So.2d 1195, 1198 (La. 1983) (flight, nervousness, or a startled look at the sight of an officer may be a factor leading to reasonable suspicion), *cert. denied,* 466 U.S. 953, 80 L. Ed. 2d 543 (1984)); *See Also, Briggs, supra* (upholding protective search where defendant was stopped in high crime area, the hour was late, and officer knew drug dealers frequently carry weapons).

In *Butler, supra,* defendant walked away after realizing a police officer had seen him. The Court in *Butler* held this was evidence of flight. In the present case, after noticing he was being followed by a marked police vehicle, the truck, in which defendant was a passenger, abruptly stopped in the middle of the street and defendant walked away. I would hold defendant displayed evidence of flight or "nervous, evasive behavior".

*Wardlow* and *Butler* mandate that Officer Miller's actions be considered in light of the "totality of the circumstances". Officer Miller testified to the following circumstances: 1) defendant was in a high crime area; 2) the apartment complex was known as an "open air drug market"; 3) Officer Miller had conducted surveillance and made arrests around this apartment complex for three to four years; 4) it was nighttime, around 9:50 p.m.; 5) defendant's truck slowed to turn into the apartment complex, and apparently seeing the police vehicle, the driver hesitated and did not turn into the complex; 6) when the police vehicle was not in view, defendant's truck returned and entered the complex; 7) upon seeing the police vehicle following him, the truck defendant was in abruptly stopped; 8) defendant stepped out of the truck while still in the middle of the street; 9) defendant walked towards a dark, closed store, also in a high drug crime area; 10) defendant smelled of alcohol; 11) when asked to stop for ques-

tioning, defendant walked away, behavior that is evidence of flight; 12) defendant refused to stop and place his hands in plain view despite requests from Officer Miller; and 13) criminals involved in drug traffic are often armed.

Defendant was present in an area of heavy narcotics trafficking. Defendant displayed nervous and evasive behavior. Defendant attempted to flee into the darkness. The majority holds that these circumstances lead "to nothing more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." I find such a holding contrary to the precedent discussed above. Therefore, I respectfully dissent from Part II of the majority's opinion.

I would also hold that the protective search and subsequent seizure of contraband was lawful. The Supreme Court has held that seizure of nonthreatening contraband detected during a pat down search is permissible as long as the officer's search was within the bounds authorized by *Terry. Minnesota v. Dickerson*, 508 U.S. 366, 124 L. Ed.2d 334 (1993).

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity **immediately apparent**, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

*Id.* at 375-76, 124 L. Ed.2d at 346 (emphasis supplied). The "immediately apparent" requirement is satisfied if the police have probable cause to believe that they have come upon evidence of criminal conduct during the pat down search. *State v. White*, 322 N.C. 770, 370 S.E.2d 390, *cert. denied*, 488 U.S. 958, 102 L. Ed.2d 387 (1988). "Probable cause is a 'common sense, practical question' based on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *State v. Wallace*, 111 N.C. App. 581, 584, 433 S.E.2d 238, 240 (1993) (citation omitted). "The standard to be met when considering whether probable cause exists is the totality of the circumstances." *Id.*

Officer Miller testified that drug dealers often carry weapons. Defendant was in an area known for its drug trafficking, it was nighttime, and defendant was acting suspicious and evasive. Officer Miller testified that he was familiar with the mass and contour of crack

cocaine. Using his expertise and tactile senses, Miller possessed probable cause under the circumstances to believe that the contraband in defendant's pocket was crack cocaine. Officer Miller was justified in seizing the contraband without a warrant. Therefore, I would affirm the decision of the learned trial court.