HUNTER, JR., Robert N., Judge.
*666 On 4 May 2016, Ahmad Jamil Nicholson ("Defendant") filed a motion to suppress evidence obtained by law enforcement officers following a traffic stop. On 9 May 2016, the trial court orally denied Defendant's motion *350 to suppress.[1] Defendant appeals following a 12 May 2016 verdict convicting him of common law robbery. On appeal, Defendant contends the trial court erred by denying his motion to suppress evidence. We find prejudicial error and grant a new trial for Defendant.
I. Factual and Procedural History
On 14 March 2016, a Forsyth County Grand Jury indicted Defendant for robbery with a dangerous weapon. On 4 May 2016, Defendant filed a written, verified motion to suppress "any and all statements obtained from the defendant" while he was "seized" on the morning of 23 December 2015. On 9 May 2016, the Forsyth County Superior Court called Defendant's case for trial. After addressing other pretrial motions (not in contention on appeal), the trial court heard Defendant's motion to suppress.
In opposition to the motion, the State called Lieutenant Damien Marotz, the arresting officer. Around 4:00 a.m., on 23 December 2015, Lt. Marotz drove west down West Mountain Street in Kernersville, North Carolina. As he approached the intersection of West Mountain Street and West Bodenhamer Street, he noticed a car parked in the road, facing east, just past the Petro 66 gas station. "It was just sitting there in the turn lane, with its headlights on and no turn signals...." There were no reports of criminal activity in the area that morning.[2]
*667 As Lt. Marotz drove towards the stationary car, he saw two African American men inside the car; one man sat in the driver's seat, and the other passenger sat directly behind the driver, with the front passenger seat empty. Lt. Marotz later identified the passenger as Defendant. Although it was "in the 40s" and "misting rain[,]" both windows on the driver's side of the car were down. Defendant began to pull down "a toboggan-style mask of some kind" to approximately "the bridge of [his] nose[,]" but "pushed it back up" as Lt. Marotz pulled up next to the car. However, Lt. Marotz did not know if the garment actually had eyeholes.
Lt. Marotz rolled his window down and asked both men if everything was okay. Both men confirmed everything was okay, and the driver, Quentin Chavis, explained "[Defendant] was his brother and ... they had gotten into an argument and that everything was okay now, that they were not arguing anymore." Defendant agreed, stating, "Yes, Officer, everything's fine."
Lt. Marotz "did not observe a sign of struggle" between the men. However, "something just didn't seem quite right." He asked, again, if the men were sure everything was okay. Both men "[shook] their head[s] and agree[d]" everything was okay. Lt. Marotz noticed Chavis "move[ ] his hand up ... scratching" or "making a motion with his hand[.]" Lt. Marotz specifically recalled this action because he "kept watching everybody's hands to make sure they didn't have any weapons." Lt. Marotz inquired, again, if they needed any help, and the men continued to confirm "everything was fine."
Lt. Marotz drove into the gas station parking lot. He decided to continue watching the car because he "felt like something wasn't quite right" and he "wanted to make sure that they didn't continue to argue[.]" Approximately thirty seconds elapsed, and the car did not move. Lt. Marotz decided to speak with the men again and got out of his car to walk over to them. Lt. Marotz "thought it was odd that they were just still sitting in the middle of the road." Lt. Marotz activated his body-worn camera[3] and called for backup.
As Lt. Marotz walked towards the car, Defendant got out of the backseat. Chavis pulled the car forward approximately two feet and stopped. Lt. Marotz called out to Chavis, "Hey. Where are you going? Are you going to leave your brother just out here?" Chavis replied he was late and needed to get to work.
*351 *668 Again, Lt. Marotz inquired if everything was okay. Initially, both men continued to confirm everything was okay. However, the second time Lt. Marotz inquired, Chavis shook his head, as if to indicate "No." But Defendant continued to say, "No, Officer. Everything is fine." Lt. Marotz responded, "Well, your brother here in the driver's seat is shaking his head. He's telling me everything's not fine. Is everything fine or not? Is everything good?" Chavis interrupted Lt. Marotz and stated, "No, Officer, everything's fine. I've just got to get to work." Chavis explained he worked at FedEx. Lt. Marotz described Chavis as "hurried" and "just ready to go[,]" noting he "edged the vehicle forward a couple of feet[.]" After Defendant confirmed again everything was okay, Lt. Marotz told the driver, "Okay. Go to work." Lt. Marotz explained "if I wanted to continue the investigation, I could have went [to FedEx]" to speak with Chavis. However, Lt. Marotz did not know the identity of the driver at this time.
Defendant continued to "st[and] there[,]" but stated he was going to go to the store. Lt. Marotz responded, "Hang on a minute.... Do you have any weapons on you?" Lt. Marotz confirmed this was a command, and Defendant was thereafter "detained." He wanted to make sure he was not being followed "with any sort of weapon" and it was not unusual for him to ask such a question, given the darkness and early morning hour. Defendant told Lt. Marotz he had a knife. Defendant explained "he normally carries a knife because he wants to make sure he doesn't get robbed." Lt. Marotz asked Defendant where the knife was, but advised him not to reach for it. Despite Lt. Marotz's instruction, Defendant moved "his hand into his left pants pocket." At that point, Lt. Marotz drew his firearm, but kept it lowered by his side.
Officers Oriana and Feldman arrived on the scene. Defendant removed his hand from his pocket and stated, "Just don't shoot me." Lt. Marotz asked Defendant several times to put his hands on his head and to step out of the road to avoid approaching traffic before he complied. Defendant appeared confused and "slow ... to listen to ... instructions and ... commands." Defendant asked several times, "What am I doing?" Defendant also had "a moderate odor of alcohol on his person, and his speech was slurred."
One of the backup officers asked Defendant where the knife was. Defendant responded, "It's in my waistband" and began to reach for it. Lt. Marotz and the backup officers told Defendant to put his hands back on top of his head. Defendant complied. Officer Feldman performed a pat-down, but he could not locate a knife. Throughout the process, Defendant attempted to lower his hands repeatedly, and officers advised *669 him multiple times to keep his hands on the top of his head. Officer Feldman performed a second pat-down, but he still could not find a knife on Defendant. Lt. Marotz told Defendant they could not locate a knife. Defendant replied, "he didn't have the knife on him, that he used to carry this knife but that sometimes he carries a knife."
Then, Lt. Marotz asked Defendant for his identification.[4] Officer Feldman provided Defendant's information over the radio. Lt. Marotz continued to question Defendant about "what was going on with him and his brother" because he "wanted to make sure that there wasn't any problems and that he wasn't injured, [and] his brother wasn't injured ... because something did not seem quite right." When asked why he continued to question Defendant when "[he] had no evidence of any criminal activity that [he] was able to objectively point to[,]" Lt. Marotz answered he "wanted to make sure that both [Defendant] and also [Chavis] were safe and that nothing had happened to either one of them."
Officer Oriana also asked Defendant where he lived. Defendant did not answer the question and instead asked several times whether Officer Oriana was going to give him a ride *352 home. Defendant became "angry" and "aggressive." Lt. Marotz instructed Officer Oriana not to give Defendant a ride home because Defendant appeared to be "impaired."
Defendant also made several other statements, including he was late for work and his brother had let him borrow the car so he could go to work. However, Defendant refused to say where he worked, and Defendant's statement regarding borrowing the car "didn't make any sense because [Chavis] was driving the vehicle."
After determining there were no active warrants against Defendant, Lt. Marotz told Defendant, "You're free to go." Defendant told officers he was going to the store. However, he remained with Lt. Marotz and the two officers for approximately another thirty seconds. He asked for a cigarette and a lighter, but they did not have any. Defendant started heading towards the store, but one of the officers informed Lt. Marotz the store was closed. Lt. Marotz called out to Defendant, "I'm sorry, sir. I didn't realize the store is closed." The entire encounter lasted approximately eight to ten minutes.
*670 Lt. Marotz confirmed his body-worn camera recorded the entire encounter, and the video footage "fairly and accurately" depicted the interaction. The defense "stipulate[d] for [the] hearing [the video was] admissible to play." The trial court viewed the video.
Following arguments from the defense, the trial court denied Defendant's motion to suppress. The trial court reconvened on 10 May 2016 and proceeded to trial.
The State first called Chavis to testify.[5] On 23 December 2015, at around 3:00 a.m., Chavis woke up for work. Around 3:40 a.m., he drove out of his parents' neighborhood, towards the intersection of Westlo Drive and Mountain Street. There, he saw Defendant waving at him. Chavis did not know Defendant. However, he stopped because he thought Defendant might need help. Defendant asked for a ride to a nearby gas station. Chavis told Defendant he could not give him a ride because he was going to be late for work. Defendant then asked for a "blunt[,]" and Chavis told him he did not have one. When Defendant again asked for a ride, Chavis again refused.
Then, Defendant "just got in the car" and said, "I'll just sit in the back." Chavis decided to give Defendant a ride to the gas station because he believed "[Defendant was] not going to get out because he really need[ed] a ride" and "it was raining...." Defendant told Chavis, "I see you're living good" and he liked his shoes that were in a bag. Defendant explained that his phone died and he just needed a ride.
The two arrived "in front of the Petro 66 gas station[.]" Chavis said, "Here you go, man. Can you just get out because I'm late for work." At that point, Defendant placed a knife against Chavis's neck and said, "Well, let's just make this easy. Give me everything you have, any money you have." Chavis told Defendant he did not have any cash. Defendant ordered Chavis to give him his credit card. Chavis gave Defendant his State Employees' Credit Union savings card. Defendant asked for Chavis's pin number, and Chavis told him a fake number. Defendant then said he would not be able to remember the number and told Chavis to write it down. Defendant rummaged through the middle console and found a pen and paper to write on. Defendant wrote the pin down.[6]
*671 Defendant leaned forward and warned Chavis not to cancel the card. Chavis confirmed he would not. During this time, Chavis felt "nervous and scared[,]" but explained he "was always taught" not to show any fear "because when you show fear, that's when-that's when it makes it easier for the person."
Defendant moved the knife "as if he was going to stab [Chavis.]" Defendant said, "he had nothing to lose" and he "didn't have a problem sticking [Chavis.]" At that point, Chavis noticed a car approaching. Defendant "tried to pull his toboggan over his face[.]" Lt. Marotz pulled up beside the car in the *353 opposite lane. Chavis spoke with Lt. Marotz, but he did not tell the officer what was going on because he "didn't know what the defendant was going to do[,]" or whether "he still had a knife on him[,]" and "[t]here was only one officer."[7] However, Chavis attempted to signal to Lt. Marotz "to show him that everything wasn't okay" by "winking real hard ... to see if he could identify I was trying to wink at him on purpose[.]" He also made a "cut throat" gesture.
Chavis called his mother and told her and his father about the incident. Then he went to work, arriving at around 4:15 a.m. Chavis returned home around 6:30 a.m. and then went to the police station with his father.
Upon arriving at the police station at approximately 7:00 or 7:15 a.m., Chavis conveyed the same story and provided a written statement. Chavis identified Defendant as the person who robbed him, from a photographic lineup[8] containing seven[9] photos.[10] An officer searched Chavis's car and found a knife[11] in the backseat, behind the passenger seat.[12] After returning home, Chavis began to clean out his car and found *672 his bank card in an "envelope that [ ] had [his] pay stub from Fedex[.]"[13] Chavis called police to notify them "[Defendant] didn't take the card. He just left the card."
Lt. Marotz also testified, providing largely the same information regarding his encounter with Defendant as he did during the motion to suppress hearing.[14] The State published the footage from Lt. Marotz's body-worn camera to the jury.
The State called Officer Serrin. Officer Serrin largely confirmed Chavis's testimony regarding their interaction at the police station. He provided additional details regarding the knife he seized from Chavis's car, describing it as a "steak knife." He specifically recalled, "It had a logo on it, the J. A. Henckels logo on it. I recognized it because that's the same brand of knife that I have."
After obtaining a warrant for Defendant's arrest, Officer Serrin and several other officers went to Defendant's home and obtained permission to search the home.[15] Officer Serrin found a J.A. Henckels knife block in the kitchen.[16] "[T]he block [had] two sections. It *354 had one section for steak knives, and above that was a section for other cooking knives." A single steak knife was missing. "[He] pulled out one of the steak knives out of the block, and it looked identical to the knife [he] found in [Chavis's] car." When asked, Officer Serrin admitted the knife seized from Chavis's car looked much older than the pictures of the knives in the block, but believed "the latent print dust" contributed to this appearance. He did not seize the knife block because "it wasn't evidence of a crime. It was what [he] compared evidence to." The State published pictures of the knife set to the jury. *673 The State rested.[17] Defendant offered no evidence on his behalf. On 12 May 2016, the jury found Defendant guilty of common law robbery. The trial court sentenced Defendant to a suspended sentence of ten to twenty-one months. On 13 May 2016, Defendant gave timely oral and written notice of appeal.
II. Standard of Review
Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke , 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982) (citations omitted). "The trial court's conclusions of law ... are fully reviewable on appeal." State v. Hughes , 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).
"[A]n error under the United States Constitution will be held harmless if 'the jury verdict would have been the same absent the error.' " State v. Lawrence , 365 N.C. 506, 513, 723 S.E.2d 326, 331 (2012) (quoting Neder v. United States , 527 U.S. 1, 17, 119 S.Ct. 1827, 144 L.Ed.2d 35, 52 (1999) ). "[T]he government bears the burden of showing that no prejudice resulted from the challenged federal constitutional error." Id. at 513, 723 S.E.2d at 331 (citations omitted).
III. Analysis
We review Defendant's contentions in two parts: (A) whether Lt. Marotz possessed reasonable suspicion to seize Defendant; and (B) whether the trial court's denial of Defendant's motion to suppress resulted in reversible error.
A. Reasonable Suspicion
On appeal, Defendant contends the trial court erred in denying his motion to suppress. Specifically, Defendant argues Lt. Marotz lacked reasonable suspicion, and, accordingly, Defendant was "seized" in violation of his Fourth Amendment rights. We agree.
The Fourth Amendment protects "against unreasonable searches and seizures...." U.S. Const. amend. IV. Fourth Amendment protections *674 are "applicable to the states through the Due Process Clause of the Fourteenth Amendment." State v. Watkins , 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994) (citing Mapp v. Ohio , 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 1090 (1961) ). The North Carolina Constitution also affords individuals similar protections. State v. Barnard , 362 N.C. 244, 246, 658 S.E.2d 643, 645 (2008) (citing N.C. Const. art. I, § 20 ).
Under the Fourth Amendment, a "seizure" occurs when a police officer "restrains [an individual's] freedom to walk away[.]" Terry v. Ohio , 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889, 903 (1968). Thus, Fourth Amendment protections are applicable to "police conduct [even] if the officers stop short of ... a 'technical arrest[.]' " Id. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 904 ; Watkins , 337 N.C. at 441, 446 S.E.2d at 69-70 (applying Fourth Amendment protections to a "brief" investigatory detention).
"An investigatory stop must be justified by 'a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.' " Watkins , 337 N.C. at 441, 446 S.E.2d at 70 (quoting *355 Brown v. Texas , 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362 (1979) ). "[D]ue weight must be given not to [an officer's] inchoate and unparticularized suspicion or 'hunch.' " Terry , 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (citation omitted). Rather, reasonable suspicion must be based on "rational inferences" drawn from "specific and articulable facts ... as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." Watkins , 337 N.C. at 441, 446 S.E.2d at 70 (citing Terry , 392 U.S. at 21-22, 88 S.Ct. at 1880-81, 20 L.Ed.2d at 906 ; State v. Thompson , 296 N.C. 703, 706, 252 S.E.2d 776, 779, cert. denied , 444 U.S. 907, 100 S.Ct. 220, 62 L.Ed.2d 143 (1979) ). "[T]he totality of the circumstances-the whole picture-must be taken into account." United States v. Cortez , 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). "[W]holly lawful conduct [may in certain circumstances] justify the suspicion that criminal activity was afoot." United States v. Sokolow , 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1, 11-12 (1989) (citation omitted).
"In applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." Ohio v. Robinette , 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347, 354 (1996). However, "courts have recognized factors such as activity at an 'unusual hour[,]' and 'an area's disposition toward criminal activity' as articulable circumstances which may be considered along with more particularized factors to support reasonable suspicion[.]" State v. Parker , 137 N.C. App. 590, 601, 530 S.E.2d 297, 304 (2000) (citations omitted). "Conflicting statements", State v. Johnson , --- N.C. App. ----, ----, 783 S.E.2d 753, 762-63 (2016) (citing State v. Hernandez , 170 N.C. App. 299, 308, 612 S.E.2d 420, 426 (2005) ), as well as a vehicle "stopped in a lane of traffic *675 on the road way" have also provided basis for reasonable suspicion. State v. Evans , --- N.C. App. ----, ----, 795 S.E.2d 444, 454-56 (2017) (holding reasonable suspicion supported by: "(1) defendant['s vehicle] stopped ... in a lane of traffic on the roadway; (2) ... an unknown pedestrian approach[ing] the car and lean[ing] in the window; and (3) th[e] incident occur[ing] at 4:00 a.m. in an area known ... to be a location where drug sales frequently took place").[18]
At the outset we note, the trial court denied Defendant's motion to suppress orally.
If the trial court provides the rationale for its ruling from the bench and there are no material conflicts in the evidence, the court is not required to enter a written order. If these two criteria are met, the necessary findings of fact are implied from the denial of the motion to suppress. If there is not a material conflict in the evidence, it is not reversible error to fail to make such findings because we can determine the propriety of the ruling on the undisputed facts which the evidence shows.
State v. Wainwright , 240 N.C. App. 77, 83, 770 S.E.2d 99, 104 (2015) (internal citations and quotation marks omitted).
For the motion to suppress, only Lt. Marotz testified. Defendant declined the opportunity to present any evidence. Additionally, Defendant does not argue any material conflicts with Lt. Marotz's testimony. Thus, "[t]he record is sufficient to permit appellate review of the [oral] denial of [D]efendant's *356 motion to suppress." Id. at 83, 770 S.E.2d at 104. *676 Defendant does not challenge the constitutionality of his initial interaction with Lt. Marotz, but rather the point at which Lt. Marotz stopped Defendant from going to the store. Lt. Marotz acknowledged Defendant was from that point forward, "detained," and the State does not contest this on appeal.[19] We therefore assume, without deciding, Defendant was from that point forward "seized" until Lt. Marotz told him he was free to leave.
We turn to whether Lt. Marotz possessed reasonable suspicion to seize Defendant. We begin with Lt. Marotz's cross examination:
Q. And you, at that point, had no evidence of any criminal activity that you were able to objectively point to. Correct?
A. No. That's why I was continuing to investigate.
Q. So you were looking to see if you could find anything, but you hadn't yet seen anything?
A. That's correct. I wanted to make sure that both your client and also the alleged victim were safe and that nothing had happened to either one of them.
State v. Murray , 192 N.C. App. 684, 666 S.E.2d 205 (2008) provides relevant guidance. In Murray , the law enforcement officer similarly testified, "he had no reason to believe that Defendant was engaged in any unlawful activity at the time of the stop." Id. at 684, 666 S.E.2d at 206. Despite the reference to facts that "were general to the area, namely, the 'break-ins of property at Motorsports Industrial Park ... the businesses were closed ... no residences were located there ... [and it] was in the early hours of the morning,' " this Court concluded the officer did not have a basis for reasonable suspicion. Id. at 689, 666 S.E.2d at 208-09. The Court reasoned, "[the officer] never articulated any specific facts about the vehicle itself to justify the stop ..." and "[t]o hold otherwise would make any individual in the Motorsports Industrial Park 'subject to arbitrary invasions solely at the unfettered discretion of officers in the field.' " Id. at 689-90, 666 S.E.2d at 208-09 (emphasis added) (citation omitted).
Here, Lt. Marotz similarly confirmed he had no evidence of any criminal activity to which he could objectively point. However, unlike *677 Murray which relied solely on facts "general to the area," Lt. Marotz pointed to Defendant's toboggan, stating, "[t]he only thing I saw with [Defendant] was the-what I was concerned about was the-when he was pulling the toboggan down over his head. I wasn't sure exactly what was going on at that point." Notably, although Lt. Marotz initially suggested the garment appeared to be "a toboggan-style mask ... the [kind] with the holes in the eyes[,]" Lt. Marotz confirmed he did not know whether the toboggan actually had any eyeholes.
The State points to several factors in support of its argument for reasonable suspicion, including: (1) the unoccupied front passenger seat-despite there being two occupants in the car-with Defendant seated in the backseat, directly behind Chavis; (2) the car's stationary position "in the middle of the road"; (3) Lt. Marotz's knowledge that Defendant and Chavis had just been engaged in "a heated argument"; (4) the inconsistent answers provided by Chavis when asked whether everything was okay; and (5) the early morning hour. However, unlike the "totality of the circumstances" present in Evans , the circumstances present here do not logically lead to the same conclusions. See Evans , --- N.C. App. at ----, 795 S.E.2d at 454-56. This is especially true in light of the fact Lt. Marotz already questioned both Defendant and Chavis twice and subsequently released Chavis so he could go to work after he assessed the situation and concluded "[i]t was a heated argument between two brothers."
Moreover, when asked why he seized Defendant and inquired whether Defendant was armed, Lt. Marotz stated, "Well, it's just a common thing that I ask everybody that's out at 4:00 A.M. in the morning, in the dark. And if you're-I just want to make sure that if I'm coming out with you, you don't-you're *357 not following me with any sort of weapon." Such basis for a "seizure" would have made "any individual in the [area] subject to arbitrary invasions" as was contemplated in Murray . Murray , 192 N.C. App. at 689-90, 666 S.E.2d at 208-09 (emphasis added) (citation and quotation marks omitted).
" '[A] series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together' " can in certain circumstances "warrant[ ] further investigation." Sokolow , 490 U.S. at 10, 109 S.Ct. at 1587, 104 L.Ed. 2d at 12 (citation and quotation marks omitted). However, the acts present here, when taken together do not provide a basis for reasonable suspicion. Accordingly, we conclude Lt. Marotz lacked reasonable suspicion to stop Defendant, and the trial court erred in denying Defendant's motion to suppress.
*678 B. Prejudicial Error
Defendant also contends the trial court's denial of his motion to suppress resulted in reversible error. We agree.
Some constitutional errors in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.... [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. In deciding what constituted harmless error ... the [United States Supreme] Court said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."
State v. Johnson , 29 N.C. App. 534, 537-38, 225 S.E.2d 113, 115-16 (1976) (citation and quotation marks omitted) (first alteration in original). If other "overwhelming evidence" supports the conviction beyond a reasonable doubt, the erroneous admission of the contested evidence is harmless error. State v. Johnston , 154 N.C. App. 500, 503, 572 S.E.2d 438, 441 (2002) (citations omitted) (holding erroneous admission of evidence was harmless due to the "overwhelming evidence of defendant's guilt" as established by the positive identification of defendant by various witnesses and defendant's presence at the crime scene). We must, therefore, determine whether the evidence, excluding "any and all statements obtained from the defendant as a result of the unlawful seizure and detention of the defendant[,]" supports Defendant's conviction of common law robbery. We note this only excludes the statements from Defendant during the time Lt. Marotz stopped him from going to the store and when officers conducted two pat-downs.
"Common law robbery 'is the felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence or putting him in fear.' " State v. Carter , 186 N.C. App. 259, 262, 650 S.E.2d 650, 653 (2007) (quoting State v. Stewart , 255 N.C. 571, 572, 122 S.E.2d 355, 356 (1961) ). " 'It is not necessary to prove both violence and putting in fear-proof of either is sufficient.' " Id. at 262, 650 S.E.2d at 653 (quoting State v. Moore , 279 N.C. 455, 458, 183 S.E.2d 546, 547 (1971) ).
Here, much of the evidence used to support Defendant's conviction was derived from Lt. Marotz's unconstitutional seizure; thus, it was fruit *679 of the poisonous tree and should be suppressed. Fourth Amendment protections are enforced through the "exclusionary rule." State v. McKinney , 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006). Under the exclusionary rule "evidence derived from an unconstitutional search or seizure is generally inadmissible in a criminal prosecution of the individual subjected to the constitutional violation." Id. Additionally, the "fruit of the poisonous tree doctrine," provides "when evidence is obtained as the result of illegal police conduct, not only should that evidence be suppressed, but all evidence that is the 'fruit' of that unlawful conduct should be suppressed." State v. Pope , 333 N.C. 106, 113-14, 423 S.E.2d 740, 744 (1992).
Defendant's conviction is supported by the following: (1) Chavis's testimony regarding the robbery; (2) Chavis's positive identification of Defendant from a photographic lineup; (3) Chavis identifying Defendant as the robber in court; (4) the steak knife found in Chavis's car; and (5) the block of knives found in Defendant's residence, missing one steak knife and bearing a striking resemblance *358 to the steak knife seized from Chavis's car.
Had Lt. Marotz not seized Defendant, he would not have obtained Defendant's identification.[20] Therefore Chavis' subsequent identification of Defendant both in a photograph line-up and in open court would not have occurred. Additionally, while Defendant was unlawfully seized he disclosed his habit of often carrying a knife on his person. This information led to the seizure of the knife from Chavis's car, and the subsequent search of Defendant's home which revealed the block of knifes. Because evidence that would not be discoverable but for the unconstitutional seizure must be suppressed, McKinney , 361 N.C. at 58, 637 S.E.2d at 872, this evidence should have been suppressed. We, therefore, conclude the evidence admitted from Defendant's unlawful seizure resulted in prejudicial error.
IV. Conclusion
For the foregoing reasons, we conclude Defendant's seizure violated his Fourth Amendment rights. Lt. Marotz lacked reasonable suspicion for the investigatory stop of Defendant. Additionally, the trial court's *680 denial of Defendant's motion to suppress was prejudicial error entitling Defendant to a new trial.
NEW TRIAL.
Judge DAVIS concurs.
Judge MURPHY dissents in a separate opinion.

We note, the trial court suggested a written order would be prepared by Mr. Matthew H. Breeding, counsel for the State, but no written order is included in the record.

Lt. Marotz did not specify how he knew there were no reports of criminal activity, but testified there were no reports and confirmed he was conducting a "routine" patrol.

Lt. Marotz's body-worn camera did not activate the first time he attempted to turn it on. He had to hit it two additional times before it activated.

Based on Lt. Marotz's testimony during the motion to suppress hearing, we are unable to ascertain exactly how Defendant's identification was produced. Lt. Marotz's testimony during trial provided further clarification. It appears Officer Feldman removed Defendant's wallet from Defendant's pocket and Defendant "reached over and grabbed the ID-or the wallet out of the officer's hand and says, 'I can give you my ID.' "

The State also called the following witnesses: (1) Bobby Chavis, Quentin Chavis's father; (2) Sergeant Dan Wemyss, who administered the photographic lineup; and (3) Detective Alan Cox, who interviewed Quentin Chavis.

In his initial testimony and his written statement to police, Chavis said he wrote the pin down, not Defendant.

Chavis testified, "[Defendant] still had the knife to my neck." We note, although Lt. Marotz testified he was trying to keep an eye on everyone's hands, he could not actually see Defendant's hands, and only knew they were down, and he did not see a knife. He did note, "It was dark out."

Chavis also identified Defendant as the man who robbed him during his testimony.

Chavis's testimony conflicts with Officer J.D. Serrin's as to whether there were seven or eight photos in the lineup.

Chavis first chose the first photo, but considered the sixth photo. After determining the man in the sixth photo was too large to be his robber, he ultimately chose the first photo, Defendant's photo.

The trial court admitted the knife into evidence, and it was shown to the jury.

Chavis rode to the police station with his father, in his father's car. Initially, the officer told Chavis he would go to Chavis's house to search Chavis's car. However, officers later instructed Chavis to return to the police station. He returned to the station with his car around 8:00 a.m., approximately thirty minutes after he originally left.

Chavis explained he keeps his old pay stubs in his car, and the pay stub in the envelope in his card "was an older pay stub."

Defendant requested a line objection with respect to evidence obtained from the encounter with Defendant after Lt. Marotz "seized" him, thus preserving the issue of admissibility for appeal. State v. Randolph , 224 N.C. App. 521, 528, 735 S.E.2d 845, 851 (2012) (quoting State v. Oglesby , 361 N.C. 550, 554, 648 S.E.2d 819, 821 (2007) ) ("[A] trial court's evidentiary ruling on a pretrial motion is not sufficient to preserve the issue of admissibility for appeal unless a defendant renews the objection during trial.").

Defendant's mother, and owner of the home, gave consent.

Defendant moved in limine to "prohibit[ ] the State or any of its witnesses, from stating in the presence of the jury any information relating to an allegedly matching set of steak knives missing one which matched the knife recovered from the back of the complaining witness' car" because police failed to seize the set of knives. The court denied Defendant's motion, and Defendant does not raise this issue on appeal. Because this issue is not raised on appeal, we do not address it. N.C. R. App. P. 28(a) (2016) ("The scope of review on appeal is limited to issues so presented in the several briefs. Issues not presented and discussed in a party's brief are deemed abandoned.").

As noted supra in footnote 5, the State called several other witnesses whose testimonies are not included in this discussion.

We note both the State and Defendant cite State v. Roberts , 142 N.C. App. 424, 542 S.E.2d 703 (2001). However, Roberts is no longer binding precedent. The North Carolina Supreme Court allowed the Attorney General's motion "to vacate judgment of Court of Appeals[.]" State v. Roberts , 353 N.C. 733, 551 S.E.2d 851 (2001). Defendant argues because the Supreme Court only vacated the judgment, not the opinion, Roberts is still binding precedent. Our research shows Roberts passed away while imprisoned on 10 January 2001. See North Carolina Department of Public Safety Offender Public Information, (http://webapps6.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=03466190346619&searchLas tName=roberts&searchFirstName=James&searchMiddleName=d&listurl=pagelistoffendersearchresults&listpage=1) (last visited August 9, 2017). "Under North Carolina Rule of Evidence 201, we take judicial notice of this fact from the Department of Public Safety website's offender search results." State v. Harwood , 243 N.C. App. 425, 427 n.2, 777 S.E.2d 116, 118 (2015) (citations omitted). Because Roberts passed away before this Court filed its opinion, and thus before his conviction was final, the entire prosecution is abated ab initio . See State v. Dixon , 265 N.C. 561, 561-62, 144 S.E.2d 622, 622-23 (1965).

The State does note in passing, perhaps it was not a "seizure" because Defendant remained with police even after he was told he was free to leave.

The record does not suggest the State would have been able to independently link the unknown suspect directly to Defendant, or obtain the evidence resulting from knowledge of Defendant's name.